**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

APPELLANT PRO SE:

**ROBERT L. MURRAY**
Pendleton, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

**FILED**
May 28 2013, 9:43 am
**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT L. MURRAY, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 45A05-1205-PC-274 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
The Honorable Natalie Bokota, Magistrate
Cause No. 45G04-1003-PC-7

**May 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Robert L. Murray appeals the post-conviction court's denial of his petition for post-conviction relief following a hearing. Murray raises three issues for our review,[1] which we consolidate and restate as:

1. Whether the post-conviction court abused its discretion when it determined that Murray was not denied the effective assistance of trial counsel; and

2. Whether the post-conviction court abused its discretion when it determined that Murray was not denied the effective assistance of appellate counsel.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts underlying Murray's convictions are set out in his direct appeal:

> Murray was age thirty. He had three teenage cousins, E.H., J.M., and D.H., who resided with their mother in Hammond (the "house"). On December 21, 2007, Murray was at the house to fix a wall in the basement. That afternoon, J.M. arrived with two males, G.D. and someone known as Joe or "Dollar." At some point, Murray and his three cousins were in the basement with G.D., Dollar and a friend of D.H. As the seven talked, someone suggested that they "go for fast money." After some discussion and preparation, Murray, E.H., J.M., G.D., and Dollar (the "five males") put on hoodies and/or jackets, gloves, hats, and things to cover their faces. They planned to rob a nearby liquor store.

> In darkness, the five males left the house. Murray carried an AK-47 that was wrapped in something, Dollar carried a revolver, and two others carried bags. Walking through the alleys, they reached the liquor store, confirmed that the area was clear, and entered the store.

> At approximately 5:30 p.m., Talat Haddad ("Talat") was in a back room of the liquor store with his seventeen-year-old son, Issa Haddad

---

[1] Murray raised numerous issues in his amended petition for post-conviction relief and in his brief in the present appeal. But in his reply brief, Murray limited his arguments to those discussed above and "voluntarily waive[d]" the other issues previously raised. Reply Brief at 8. We limit our discussion accordingly.

2

("Issa"). A bell rang; Talat left the back room to see who had entered the store. Two masked males put guns to his face. Talat grabbed the end of the AK-47, but one of the males placed a handgun to Talat's head. Per instruction, Talat lay down on the floor. Other masked men entered the store. One began to place alcohol and cigarettes into a bag; another ordered Talat to open the store's cash register. Talat later testified, "[i]t was a very, very scary situation. I don't know what time I'm going to be shot. When I'm going to be shot. It's a very scary moment to me."

While this was occurring, Issa looked out of the back room and saw two males holding guns to his father's head. Issa ran to the phone in the back room, but was stopped by the two gunmen. They pointed their guns at him, started yelling, and demanded that he open the safe. When he told them that he did not know its location, the males ordered Issa to lie face down. One searched the back room and took the store owner's handgun, while the other kept a gun pointed at Issa. Just before the males left, one of them hit the back of Issa's head with a gun. His head hurt for a week. Ultimately, the five males took money from the store's cash register, alcohol, cigarettes, and the owner's handgun.

The five males returned to the house after having been gone fifteen to twenty minutes. Murray was still carrying the AK-47. They entered through the back door of the house, went immediately to the basement, and divided the stolen money. Upon investigation, the police traced the males to the house, where they were arrested.

Issa downloaded data from the surveillance camera and gave this information to the police. The video revealed that the five males were in the liquor store for two minutes. The State charged Murray with Robbery of Talat and Issa, Confinement of Issa, and Battery of Issa.

At trial, Murray presented one witness, G.D. On direct examination, G.D. acknowledged having initially lied to the police regarding who participated in the robbery, using "made-up" names. He testified that he was trying to protect Dollar and D.H. On cross-examination, he admitted that he also signed a plea agreement, stating that there were four perpetrators: Murray, E.H., J.M., and himself. G.D. explained,

> I signed it because my lawyer went over it very briefly and told me if I don't sign this and take this nine years then somebody's going to tell on me and I'm facing forty-eight years. I just took whatever—I did whatever he asked me to do and I ran with it.

3

When asked for clarification about the factual stipulation in his plea agreement, G.D. testified as follows:

A: I'm not saying it's a lie. What I'm saying is I didn't read the whole thing and my lawyer didn't read the whole thing to me.

Q: But the bottom line is, that stipulated factual basis has Robert Murray's name in it, and that's a lie because he wasn't there; is that what you're now saying?

A: What I'm saying is I don't feel like he was there. He wasn't there. I didn't see him. He wasn't no [sic] part of it.

Q: When you signed your name to the document and it had Robert Murray's name there as a participant in the robbery, that's a lie?

A: Again, I'm going to tell you, I didn't see that portion of the paper.

As the State's cross-examination of G.D. continued, the prosecutor asked additional questions relating to the inconsistencies in G.D.'s assertions.

Q: So, [G.D.], if I understand your testimony to be correct, everything you said prior to today's date was a lie?

A: Everything?

Q: Who was there?

A: No, I told you I was there.

Q: Except for you being there, everything else except what came out of your mouth here today was a lie?

A: Everything that was stipulated at the police station.

Q: And everything that was stipulated in the factual basis, which you signed and agreed was accurate, was a lie?

A: If that's the way you want to put it.

Q: I'm not putting it. I'm asking . . .

4

A: Again, I'm going to keep telling you that to me I didn't feel it was a lie because I didn't see half of the stuff. I just signed it because I was under pressure.

Q: Okay. And so when Judge Stefaniak asked you if you were submitting to this plea fully and voluntarily, you lied to the Judge and said yes?

A: I fully and voluntarily signed it. I fully and voluntarily wanted to take nine years instead of having to do forty-eight years and not knowing what the outcome would be.

After additional questioning, G.D. admitted that he lied during his plea hearing. At no time did Murray object to this questioning.

After a five-day trial, the jury found Murray guilty as charged. The trial court found no mitigating circumstances and three aggravating circumstances—the fact that Murray had recently violated the conditions of his parole, his criminal history, and the fact that one of the victims was under age eighteen. It found that the aggravating circumstances outweighed the absence of any mitigating circumstances and sentenced Murray to terms of eighteen years for Robbery, eighteen years for Confinement, and six years for Battery. The terms were ordered to run consecutively and to be fully executed for an aggregate term of forty-two years.

Murray v. State, 45A03-0811-CR-561, at *1-*7 (Ind. Ct. App. July 22, 3009) (citations and footnote omitted, alterations in original) ("Murray I"). On direct appeal, Murray raised three issues: (1) whether the State's cross-examination of a witness constituted prosecutorial misconduct; (2) whether Murray's convictions for robbery and confinement violated double jeopardy principles under the Indiana Constitution; and (3) whether his sentence was inappropriate in light of the nature of the offenses and Murray's character. We affirmed Murray's convictions and sentence. Id. at *19.

On March 22, 2010, Murray filed a pro se petition for post-conviction relief. Counsel ultimately entered an appearance for Murray, withdrew the pro se petition for

5

post-conviction relief, filed another petition for post-conviction relief, and then withdrew her representation. On April 7, 2011, Murray, pro se, filed an amended petition for post-conviction relief. On September 1, October 11, and October 14, 2011, the post-conviction court held an evidentiary hearing on Murray's amended petition. And on April 30, the court entered an order with findings of fact and conclusions thereon of law ("the Order"), providing in relevant part:

> 16. Murray was convicted as charged. The court sentenced him to eighteen years on the robbery, eighteen years on the confinement and six years on the battery to be served consecutively in the Department of Correction.
> 17. Murray appealed but his convictions and sentence[s] were affirmed. He raised three issues:
> > 1). Whether the State's cross-examination of witness G.D. constituted prosecutorial misconduct;
> > 2). Whether Murray's convictions of Robbery and Confinement violated the double jeopardy clause in Article I, Section 14 of the Indiana Constitution; and
> > 3). Whether Murray's sentence is inappropriate.
> 18. On March 23, 2010, Murray filed a petition for post-conviction relief. . . .
> 19. As ultimately amended, the petition raises four claims:
> > 1). That Murray was denied effective representation by trial counsel;
> > 2). That Murray was denied effective representation by appellate counsel;
> > 3). That Murray was denied equal protection because the State knowingly used perjured testimony and an erroneous jury instruction denied him a fair trial; and
> > 4). That the convictions for robbery and confinement violate the prohibitions against double jeopardy as expressed in IC 35-38-1-6.[fn]
>
> > > [FN: Murray amended his petition several times. The final amendment was filed on June 29, 2011. The claims therein super[s]ede all preceding claims. In his proposed findings of fact and conclusions of law Murray does not address all of the claims raised; other claims are

6

raised for the first time. We [sic] address only those claims that were both plead [sic] and briefed.]

20.     The court held hearings on the petition on August 31, 2011, October 11, 2011, and October 14, 2011. Murray presented four witnesses: Samuel Vazanellis (his trial attorney), James Reed (his appellate attorney), Geovonne Davis and Demetrius Henderson (his co-defendants). The court took judicial notice of the trial and P-C files and received the transcript into evidence. Multiple exhibits were introduced as referenced herein.

21.     Mr. Vazanellis had been an attorney for several years and tried numerous cases before he represented Murray. He reviewed the discovery and interviewed witnesses and those co-defendants he was able to interview. He formulated the best defense he could conceive, objected as he deemed necessary and moved for mistrial. When Murray was convicted, Vazanellis successfully litigated a motion to dismiss the habitual offender enhancement. At sentencing he argued that the convictions of [sic] robbery and confinement violated the prohibition against double jeopardy but the court disagreed.

\* \* \*

24.     At some point prior to or during trial, Vazanellis was given hand-written, unsigned affidavits purported to have been written by Murray's co-defendants: Geovonne Davis, Eugene Henderson and Jeffrey Murray. (Pet.'s PCR Exh. 4). They are attached to a pro se pleading entitled Motion to Dismiss Case. (Id.) The motion is presented as written by Murray, is signed by Murray and references the affidavits. The motion and affidavits are written by one hand. Each affidavit contains the same misspelling of the word stemmed, to wit: stimmed. Each affidavit states that Robert Murray was not involved in the robbery. Vazanellis did not try to admit the affidavits at trial because he believed Murray had written them and Murray wanted him to seek out and obtain the signatures of the co-defendants. He concluded the affidavits were not credible, potential evidence.

25.     Co-defendant Geovonne Davis testified at Murray's trial. He testified that he participated in the robbery but Robert Murray did not. He admitted that he was convicted of theft in 1997 and robbery in 1998. He admitted that he gave a statement to the police in which he fabricated the names of those involved to protect the guilty. The State impeached Davis's credibility with this deception as well as the fact that he signed a factual basis as part of his guilty plea that implicated Murray in the crime. At the post-conviction hearing, he testified that he wrote the affidavit that bears his name but never saw the other affidavits. He reaffirmed Murray's

7

innocen[c]e. We [sic] do not find Davis' testimony credible. We [sic] find that Davis did not write the affidavit.

27. James Reed handled dozens of direct appeals prior to Murray's. He reviewed the defense file, the court file and the trial transcript. He received several letters from Murray which outlined seven issues Murray wanted Reed to pursue on appeal. Reed acknowledged that an issue not objected to at trial could nonetheless be pursued on direct appeal if so blatant as to be fundamental error. Reed considered Murray's issues, the record, and the relevant case law and raised the issues he deemed appropriate.

Conclusions of Law:

\* \* \*

15. Murray alleges trial counsel [was] ineffective for failing to interview or investigate key witnesses and use their affidavits and/or statements. Murray is referring to counsel's failure to . . . use the affidavits of his co-defendants as proof of his innocence.

\* \* \*

As for the affidavits of Murray's co-defendants, counsel deduced that Murray had written the unsigned affidavits. He determined they were not credible evidence of Murray's innocence. He made a deliberate, tactical decision to not use them. We [sic] conclude that counsel's performance concerning the affidavits did not fall below prevailing professional norms.

16. Murray has failed to prove that he was denied the effective assistance of trial counsel.

17. Murray claims appellate counsel [was] ineffective for several reasons . . .

> 1). Failure to raise a preserved error on direct appeal . . . ;
> 2). Failure to raise as fundamental error the State's knowing use of perjured testimony;
> 3). Failure to raise as fundamental error erroneous Jury Instruction Two;
> 4). Failure to raise issues adequately;
> 5). Failure to raise ineffective assistance of trial counsel on direct appeal;
> 6). Failure to file a Reply Brief; and
> 7). Failure to comply with reasonable requests for information[.]

\* \* \*

8

27. Murray alleges appellate counsel failed to adequately present his double jeopardy claim on direct appeal. Specifically, he argues that counsel should have substantiated the double jeopardy claim by referring to the charging information or producing the statement of Issa Haddad. The Indiana Court of Appeals specifically reviewed the charging information in it's [sic] analysis of the double jeopardy issue. Indeed, the appellate court emphasized that both Talat and Issa were named victims of the robbery in count I. Furthermore, the appellate court's recitation of the facts indicates it's [sic] awareness that the gun was taken from Issa's presence. Murray fails to prove he was prejudiced by Reed's presentation of the issue on direct appeal.

Appellant's App. at 2e-30 (citations omitted). The court denied post-conviction relief, and Murray now appeals.

## DISCUSSION AND DECISION

In post-conviction appeals, our standard of review is well established:

[T]he petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); Henley v. State, 881 N.E.2d 639, 643 (Ind. 2008). When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. Henley, 881 N.E.2d at 643. The reviewing court will not reverse the judgment unless the petitioner shows that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Id. at 643-44. Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). We will reverse a post-conviction court's findings and judgment only upon a showing of clear error, which is that which leaves us with a definite and firm conviction that a mistake has been made. Id. at 644. The post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004). We accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. Id.

Taylor v. State, 929 N.E.2d 912, 917 (Ind. Ct. App. 2010), trans. denied.

Murray's request for post-conviction relief is premised on his contentions that he was denied the effective assistance of trial and appellate counsel in violation of the Sixth

9

Amendment to the United States Constitution. A claim of ineffective assistance of counsel must satisfy two components. Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694. Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. See id. at 687.

We presume that counsel provided adequate representation. Sims v. State, 771 N.E.2d 734, 741 (Ind. Ct. App. 2002), trans. denied. "Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference." Id. Furthermore, a petitioner must show more than isolated poor strategy, bad tactics, a mistake, carelessness or inexperience. Law v. State, 797 N.E.2d 1157, 1162 (Ind. Ct. App. 2003). As to prejudice, "there must be a showing of a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

**Issue One: Effective Assistance of Trial Counsel**

Murray first contends that he was denied the effective assistance of trial counsel because his trial attorney failed to "interview or investigate" Geovonne Davis or obtain

10

Davis' signature on an affidavit alleging Murray's innocence prior to trial. Appellant's Brief at 18. We observe that Davis appeared at Murray's trial as a defense witness and testified that Murray was not involved in the offenses charged. Murray has not shown how an interview with or investigation of Davis by trial counsel or obtaining his signature on an affidavit would have affected Davis' testimony or, more importantly, the outcome of Murray's trial. As such, Murray has not shown prejudice arising from trial counsel's alleged failure to interview or investigate Davis before trial. And because Murray has not shown prejudice, his argument that trial counsel was ineffective for failing to interview or investigate Davis is without merit. See Strickland, 466 U.S. at 687. Murray's argument that his trial counsel was ineffective must fail.

**Issue Two: Effective Assistance of Appellate Counsel**

Murray also contends that he was denied the effective assistance of appellate counsel. Specifically, Murray argues that his appellate counsel was ineffective because he failed to argue on direct appeal that Murray's sentences for both robbery and confinement violate Indiana Code Section 35-38-1-6, which prohibits entry of a judgment of conviction on both an offense and a lesser included offense if the State charged both crimes. We cannot agree.

Indiana Code Section 35-38-1-6 provides: "Whenever: (1) A defendant is charged with an offense and an included offense in separate counts; and (2) The defendant is found guilty of both counts; judgment and sentence may not be entered against the defendant for the included offense." In other words, the statute protects defendants charged with an offense and a lesser included offense from being found guilty

11

of both charges because this would be tantamount to convicting a defendant twice for the same conduct. Harvey v. State, 719 N.E.2d 406, 411 (Ind. Ct. App. 1999). An offense is inherently included in another when it may be established by proof of the same material elements or less than all the material elements that define the "greater" crime charged. Id. An offense is factually included in another when the charging instrument alleges "the means used to commit the crime charged include all of the elements of the alleged lesser included offense." Id.

Murray contends that the "confinement charge is also included in the Robbery count in violation of I.C. [§] 35-38-1-6." Appellant's Brief at 28. He is correct that this court has held that confinement may be inherently included in robbery because the "use or threat of force" element needed to support the robbery conviction may not be distinct from the "confinement" element needed to support the criminal confinement conviction. See Harvey, 719 N.E.2d at 411. However, we have also upheld convictions for robbery and criminal confinement where each offense has a separate victim, even if the offense occurred in the same episode. See VanZandt v. State, 731 N.E.2d 450, 455-56 (Ind. Ct. App. 2000), trans. denied (upholding robbery conviction as to employee and confinement conviction as to manager in single restaurant robbery).

Here, Murray was convicted of robbing Talat and of confining Issa. As we explained in Murray I, the facts in VanZandt support the finding that Murray's double jeopardy rights were not violated. See Murray I, 45A03-0811-CR-561 at *13. Thus, we held that Murray's convictions and sentences for both robbery and criminal confinement do not violate the prohibition against double jeopardy. Id.

Indiana Code Section 35-38-1-6 is also premised on double jeopardy principles. In other words, the statute "'reinforces [the rule in Indiana's Double Jeopardy Clause, forbidding a trial court from sentencing a defendant for an offense and a lesser[ ]included offense charged in separate counts.'" Micheau v. State, 893 N.E.2d 1053, 1061 (Ind. Ct. App. 2008) (citation omitted, alteration in original). Murray's appellate counsel did, in fact, raise the double jeopardy issue on direct appeal. And our decision on the double jeopardy in Murray I bars Murray from raising the same double jeopardy issue here under the guise of Indiana Code Section 35-38-1-6. The post-conviction court did not err when it determined that that claim was barred by res judicata.

## Conclusion

Murray has not shown that his trial counsel was ineffective, nor has he shown that his appellate counsel was ineffective for failing to raise an issue on direct appeal under Indiana Code Section 35-38-1-6. As such, Murray has not shown that the post-conviction court abused its discretion when it denied his amended petition for post-conviction relief.

Affirmed.

BAILEY, J., and BARNES, J., concur.